**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**CINDY KENNON, as Administratrix of**
**the Estate of BRUCE KENNON; CINDY**
**KENNON, Individually, and on behalf**
**of all wrongful death beneficiaries of**
**BRUCE KENNON, deceased;**

      **Plaintiff**

**v.**                              **CIVIL ACTION NO.** _3:25-cv-351-KHJ-MTP_

**CITY OF BRANDON, MISSISSIPPI;**
**RANKIN COUNTY, MISSISSIPPI;**
**VITALCORE HEALTH STRATEGIES, LLC;**
**HAYDEN LUKENS, JOHN "J.P." DRAGOO,**
**JABRI SELMON, CAMERON JOHNSON,**
**EMILY WATTS, BRADY WHITE,**
**TOMMY HILDESHEIM, and VICKI LAGO,**
**in their individual capacities; and**
**JOHN and JANE DOES NOS. 1-15;**

      **Defendants**

---

**ORIGINAL COMPLAINT AND JURY DEMAND**

---

Plaintiff, Cindy Kennon, by and through counsel Josh Daniel of JOSH DANIEL LAW, PLLC, respectfully alleges for her *Original Complaint and Jury Demand* as follows:

**INTRODUCTION & SUMMARY BACKGROUND**

1.      On the morning of December 4, 2023, Pafford EMS delivered Bruce Kennon (hereinafter "Bruce") to the Merit Health River Oaks (hereinafter "River Oaks") Emergency Department. Bruce arrived at River Oaks unconscious and in acute respiratory failure while hospital staff were left trying to figure out what caused his condition. Bruce came to River Oaks

from the Rankin County Detention Center (hereinafter "RCDC"), where earlier that morning he was found unconscious in his cell.

2.    Later on December 4, 2023, Sergeant Page Ramage, a detective with Brandon Police Department (hereinafter "BPD"), appeared at River Oaks and informed hospital staff that Bruce had been arrested the day before and "it was possible [Bruce] had drank Anti-Freeze." Sergeant Ramage also told hospital staff that Bruce's "family members stated he was drinking Anti-freeze prior to Officer's [sic] responding to the residence." The referenced arrest occurred the evening before Bruce's hospitalization, and specifically at 7:39 p.m., December 3, 2023, when patrol officers with BPD arrested Bruce at his home for a domestic violence call. The part that Detective Ramage omitted in her statements to hospital staff is that the arresting officers deliberately chose not to get Bruce medical care on the night of the arrest despite knowing that Bruce had drank antifreeze and that his life was in danger.

3.    At the time of arrest, BPD's arresting officers were aware that Bruce had a history of suicidal behavior and threats. The primary officer at the scene expressed his own belief that Bruce had drank antifreeze and that Bruce's life was in danger. Despite Bruce's known history and the primary officer's subjective belief of a medical emergency, the arresting officers did not request medical assistance at the scene or transport Bruce to a hospital. The arresting officers instead proceeded to take Bruce to the station where they held him for the next three hours. The arresting officers then stood by and did nothing as Bruce's condition rapidly deteriorated in front of their eyes. All because the arresting officers, by their own admission, did not want to sit with Bruce at a hospital.

4.    BPD's arresting officers eventually transferred Bruce into the custody of RCDC. The BPD officer that transported Bruce to RCDC did not tell the jailers anything about Bruce

drinking antifreeze, because he knew if that information was disclosed then Bruce likely would not have not been accepted at RCDC and as a result BPD officers would have to take Bruce to a hospital.

5.      Upon arriving at RCDC, Bruce was in such a state that he could not sit or stand without assistance. He could not follow lines of questioning and was altogether incoherent with obvious altered mental status. Any lay person could tell that Bruce was in the midst of a medical emergency. The jailers and a licensed practical nurse noted that Bruce was "extremely intoxicated." Despite Bruce's condition and symptoms of extreme intoxication, the jailers and LPN did not refer Bruce to a higher-level, qualified medical professional capable of assessing Bruce and determining whether or not he was fit to be jailed at RCDC.

6.      Even without information that Bruce had drank antifreeze, the jailers and medical staff should have never accepted Bruce into RCDC given his cognition and their belief that Bruce was extremely intoxicated. Bruce was accepted into RCDC anyway. Bruce was then thrown into a cell overnight where he laid unconscious, facedown on the concrete floor in a puddle of urine for approximately seven hours. The jailers at RCDC stood by and did nothing as Bruce lay there in the midst of an obvious medical emergency.

7.      Only after Bruce could not be roused to eat his breakfast did jailers finally seek medical intervention. Bruce's vital signs were then taken for the first time since his arrest, and his vitals reflected that he was in medical distress. Pafford EMS was eventually dispatched to RCDC and Bruce was later transported to River Oaks.

8.      Over twelve hours passed between the time Bruce drank antifreeze and the time he arrived at River Oaks, and this delay in medical intervention was the difference in life or death. By the time Detective Ramage appeared at River Oaks and informed hospital staff that

Bruce had drank antifreeze it was too late for emergency life saving measures. The result was a slow, tortuous death in River Oaks's ICU over the next two months.

9.      Bruce suffered acute injuries to his respiratory and renal systems due to the toxin in antifreeze, i.e., ethylene glycol. He had to be intubated and extubated multiple times over the course of two months. He slipped in and out of an unconscious state during those two months. He was in constant pain during those two months. Finally, on February 2, 2024, Bruce passed away as a result of his injuries.



*Bruce at River Oaks Hospital*

10.     Bruce was 59 years old with a life expectancy of an additional 21.9 years[1] at the time of his death. He and his wife Cindy had been married for thirty six years. They had seven children, Shanna Kennon, Amber Jones, Cody Kennon, Holly Kennon, Reese Kennon, Jack Kennon, and Eli Kennon, which they raised together in Brandon, Mississippi. Bruce loved golf

---

[1] *See* National Vital Statistics Report, Vol. 72, No. 12, November 7, 2023, Table 2. Life table for males: United States, 2021.

and spending time with and cooking for his family including his 2 grandchildren. His specialty was fried chicken and anything grilled. Bruce was especially close to his grandson Colt, who shadowed Bruce everywhere he went.



*Bruce pictured alongside Cindy, his wife of 36 years*

11.     Bruce was human, and like a majority of us do, he struggled with depression and mental health. Bruce's struggle did not take away from his desire to spend time with his family and loved ones. His family members are deeply saddened knowing that he had many good years left to live. They are also saddened by the callousness that Defendants showed towards Bruce.

12.     Bruce's tragic, tortuous death was easily preventable. Ethylene glycol poisoning is rarely fatal when there is prompt and effective medical intervention within the first twelve hours of ingestion. Defendants denied Bruce the timely medical intervention which would have saved his life. Bruce's tortuous and unjustifiable death is the direct result of the Defendants' willful and deliberate indifference to Bruce's serious medical needs.



*Bruce pictured with his two grandchildren*

## <u>JURISDICTION AND VENUE</u>

13.    This Court has jurisdiction over Cindy's federal claims pursuant to 28 U.S.C. § 1331, and this case is brought pursuant to 42 U.S.C. § 1983. Jurisdiction supporting Cindy's claims for attorney fees is conferred by and brought pursuant to 42 U.S.C. § 1988. This Court has jurisdiction over Cindy's state law claims pursuant to 28 U.S.C. § 1367.

14.    Venue is proper in the Southern District Court of Mississippi, Northern Division, pursuant to 28 U.S.C. § 1391(b). All the events alleged herein occurred within the State of Mississippi, and all of the parties were residents of the State of Mississippi at all relevant times stated herein.

## PARTIES

### Plaintiff

15.     At all times relevant to the subject matter of this litigation, the decedent, Bruce Kennon, was a citizen of the United States of America and a resident of and domiciled in Rankin County, State of Mississippi. At all relevant times after his passing, Bruce's spouse Cindy Kennon was the personal representative of the Estate of Bruce Kennon.

16.     Plaintiff Cindy Kennon was Bruce's wife. At all relevant times, Cindy was a citizen of the United States of America and a resident of and domiciled in Rankin County, State of Mississippi. Cindy brings this lawsuit  in her individual capacity, as the Administratrix for the Estate of Bruce Kennon, and on behalf of the wrongful death beneficiaries of Bruce Kennon.

### Defendant City

17.     Defendant City of Brandon, Mississippi (hereinafter "Defendant City"), is a municipal corporation chartered under the laws of the State of Mississippi and is a "person" subject to suit under Title 42 U.S.C. § 1983. Defendant City may be served with process by service upon its City Clerk, Mary Ann Hess, 1000 Municipal Drive, Brandon, Mississippi 39042.

18.     Cindy sent a timely and proper notice of claim under the Miss. Tort Claims Act, providing notice of liability of Defendant City and its employees arising from the facts of Bruce's death as described herein.

19.     Defendant City fulfills its policing functions through the Brandon Police Department, which is and was at all relevant times a law enforcement agency.

20.     The Brandon Police Department is led by the Chief of Police or Police Chief who is and was at relevant times the final policymaker as it relates to:

       a.   the implementation of police policies and practices within the Brandon Police Department;

    b.   the implementation of police hiring and assignment within the Brandon Police Department;

    c.   the implementation and oversight of police training for the Brandon Police Department;

    d.   the implementation and oversight of police supervision and discipline for the Brandon Police Department.

21.     At all relevant times prior to November 7, 2023, the duly appointed Chief of Police for Defendant City was Wayne Dearman who was acting under color of state law, and was acting within the scope of his employment with Defendant City.

22.     At all relevant times including and subsequent to November 8, 2023, the duly appointed Chief of Police for Defendant City was Joseph French who was acting under color of state law, and was acting within the scope of his employment with Defendant City.

### Individual Officer Defendants[2]

23.     Defendant Hayden Lukens is an adult resident of the State of Mississippi. At all relevant times, Defendant Lukens was acting under color of state law and within the course and scope of his official duties as a police officer with BPD. Defendant Lukens may be served with process at 221 N Timber Street, Brandon, Mississippi 39042 or wherever he may be found.

24.     Defendant John "J.P." Dragoo is an adult resident of the State of Mississippi. At all relevant times, Defendant Dragoo was acting under color of state law and within the course and scope of his official duties as a police officer with BPD. Defendant Dragoo may be served with process at 1455 W Government Street, Brandon, MS 39042 or wherever he may be found.

25.     Defendant Jabri Selmon is an adult resident of the State of Mississippi. At all relevant times, Defendant Selmon was acting under color of state law and within the course and

---

[2] "Individual Officer Defendant" collectively refers to Defendants Hayden Lukens, John Dragoo, and Jabri Selmon, who were at all relevant times acting under the color of state law as patrol officers for BPD.

scope of his official duties as a police officer with BPD. Defendant Selmon may be served with process at 1455 W Government Street, Brandon, MS 39042 or wherever he may be found.

### Defendant County

26.     Defendant Rankin County, Mississippi (hereinafter "Defendant County") is a political subdivision chartered under the laws of the State of Mississippi and is a "person" subject to suit under Title 42 U.S.C. § 1983. Defendant County may be served with process by service upon its Chancery Clerk, Mark Scarborough, 203 North Street, Brandon, Mississippi 39042.

27.     Cindy sent a timely and proper notice of claim under the Miss. Tort Claims Act, providing notice of liability of Defendant County and its employees arising from the facts of Bruce's death as described herein.

28.     Defendant County, through the Rankin County Sheriff's Office (hereinafter "RCSO"), operates the Rankin County Detention Center (RCDC) located at 211 N Timber Street, Brandon, Mississippi 39042.

29.     Defendant County is responsible for the oversight, supervision, discipline, and training of the law enforcement personnel and for the provision of medical care to inmates at RCDC.

30.     The elected Sheriff for Defendant County is and was at all relevant times the final policymaker as it relates to:

      a.  the implementation of police policies and practices at RCDC;

      b.  the implementation of hiring and assignment at RCDC;

      c.  the implementation and oversight of training at RCDC;

      d.  the implementation and oversight of supervision and discipline at RCDC.

31.     At all relevant times, the elected Sheriff for Defendant County was Bryan Bailey who was acting under color of state law, and was acting within the scope of his duties and position as the elected sheriff of Defendant County.

32.     At all relevant times, Defendant County had a nondelegable duty imposed by the Mississippi and U.S. Constitutions to provide adequate medical care to inmates and detainees at RCDC. Defendant County is liable under the nondelegable duty doctrine for the deliberate indifference of Defendant VitalCore Health Strategies, LLC (hereinafter "Defendant VitalCore"), its agents and contracted medical care providers, and its employees and contractors. Defendant County has adopted and is liable for Defendant VitalCore's deliberately indifferent policies, training, practices, habits, customs, widespread usages, and failures to adequately train and supervise their employees and contractors with respect to the serious medical needs of detainees like Bruce.

### Individual Jailer Defendants[3]

33.     Defendant Cameron Johnson is an adult resident of the State of Mississippi. At all times relevant to this civil action, Defendant Johnson acted under color of state law and within the course and scope of his official duties as a custodial officer and/or jailer at RCDC. Defendant Johnson may be served with process at 221 N Timber Street, Brandon, Mississippi 39042 or wherever he may be found.

34.     Defendant Emily Watts is an adult resident of the State of Mississippi. At all times relevant to this civil action, Defendant Watts acted under color of state law and within the course and scope of her official duties as a custodial officer and/or jailer at RCDC. Defendant Watts

---

[3] "Individual Jailer Defendants" collectively refers to Defendants Cameron Johnson, Emily Watts, Brady White, Tommy Hildesheim who were at all relevant times acting under color of state law as custodial officers or jailers for Defendant County at RCDC.

may be served with process at 221 N Timber Street, Brandon, Mississippi 39042 or wherever she may be found.

35.     Defendant Brady White is an adult resident of the State of Mississippi. At all times relevant to this civil action, Defendant White acted under color of state law and within the course and scope of his official duties as a custodial officer and/or jailer at RCDC. Defendant White may be served with process at 221 N Timber Street, Brandon, Mississippi 39042 or wherever he may be found.

36.     Defendant Tommy Hildesheim is an adult resident of the State of Mississippi. At all times relevant to this civil action, Defendant Hildesheim acted under color of state law and within the course and scope of his official duties as a custodial officer and/or jailer at RCDC. Defendant Hildesheim may be served with process at 221 N Timber Street, Brandon, Mississippi 39042 or wherever he may be found.

**Defendant VitalCore**

37.     Defendant VitalCore Health Strategies, LLC, is a Kansas Corporation with its principal address located at 719 SW Van Buren Street, Suite 100, Topeka, Kansas 66603. Defendant VitalCore may be served with process by service upon its registered agent, Corporation Service Company, 109 Executive Drive, Suite 3, Madison Mississippi 39110.

38.     Cindy sent a timely and proper notice of claim under Mississippi state law providing notice of liability of Defendant VitalCore and its employees arising from the facts of Bruce's death as described herein.

39.     At all times relevant to the subject matter of this litigation, Defendant VitalCore contracted with Defendant County to provide medical services to inmates and detainees at RCDC. At all relevant times, Defendant VitalCore was responsible for the oversight, supervision,

and training of all of the medical staff at RCDC, and for the medical care of persons housed or jailed at RCDC.

40.     At all relevant times, Defendant VitalCore was acting under color of state law and performing a central function of the state.

41.     Defendant VitalCore is a private corporation, and thus neither it nor any of its employees or contractors are entitled to any immunity under the Mississippi Tort Claims Act on state law claims or qualified or any other immunity on the federal law claims.

### Defendant Lago

42.     Defendant Vicki Lago is an adult resident of the State of Mississippi. At all times relevant to this civil action, Defendant Lago acted under color of state law and within the course and scope of her official duties as a licensed practical nurse employed by Defendant VitalCore. Defendant Lago may be served with process at 221 N Timber Street, Brandon, Mississippi 39042 or wherever she may be found.

### John & Jane Doe Defendants

43.     Defendants JOHN and JANE DOES Nos. 1-15 are yet-to-be identified employees or agents of Defendant City, Defendant County, or Defendant VitalCore whose identities have not been provided or confirmed, but who are or should be known to Defendant City, Defendant County, or Defendant VitalCore, and who shall be identified and added herein upon discovery.

### FACTUAL ALLEGATIONS PERTAINING TO DEFENDANT CITY AND THE INDIVIDUAL OFFICER DEFENDANTS

### The Individual Officer Defendants learn that Bruce drank antifreeze and that his life was in danger

44.     At or about 6:01 p.m., December 3, 2023, Cindy called 911 to report a domestic disturbance at her home located in Brandon, Mississippi.

45.     During the call, Cindy tells the 911 operator that her husband (Bruce) was "being abusive" and "trying to choke [her]." At one point during the call, Cindy is heard talking to her and Bruce's son, Reese Kennon (hereinafter "Reese"), where Reese is telling her about "a cup full of green liquid."

46.     During Cindy's initial 911 call the operator dispatched police officers with BPD to the Kennon residence in Brandon, Mississippi. At or around 6:18 p.m., the responding officers arrived at the Kennon residence. The primary officer on scene was Defendant Lukens who was being assisted by Defendant Dragoo. At some point later that night, Defendant Selmon arrived at the scene to assist on the call.

47.     Defendant Lukens was just 19 years old with little to no experience as a patrol officer.[4] Just a few months before he was hired as a patrol-trainee with BPD. Defendant Selmon was also a young, inexperienced patrol officer that upon information and belief was just a few months post-graduation from the law enforcement training academy. Defendant Dragoo was the most experienced officer at the scene, but had little more than one year's experience as a patrol officer. These three young, inexperienced officers, collectively referred to as the Individual Officer Defendants, were working Bruce's arrest without any supervision whatsoever - and upon information and belief no supervisors were on duty on the night in question.

48.     When Defendant Lukens and Defendant Dragoo first arrived at the Kennon residence, Bruce had already left the residence on foot. At one point the two officers and Bruce's son, Reese, search the backyard of the Kennon residence for Bruce. During this initial search, Reese informs Defendant Lukens and Defendant Dragoo that Bruce was observed with a cup of

---

[4] The Mississippi Board on Law Enforcement Training and Standards provides that to be qualified as a law enforcement officer applicants must be at least 21 years old among other qualifications.

antifreeze. Reese also told the officers that he believed Bruce had mixed milk with the antifreeze and drank it just before officers arrived on scene.

49.     At the time, both Defendant Lukens and Defendant Dragoo were aware of Bruce's recent history of suicide attempts and threats. Officers with BPD had arrested Bruce for DUI just two months prior after responding to a call that Bruce was at the train tracks threatening or trying suicide.[5] Bruce ultimately spent several days in RCDC for the arrest and his medical records at the time show that he was "very suicidal."

50.     After the foregoing exchange with Reese, Defendant Lukens and Defendant Dragoo proceeded to search the Kennon residence in order to locate Bruce. Upon determining that Bruce was no longer at the residence, Defendant Lukens and Defendant Dragoo obtained written statements from Cindy and Reese. In Reese's written statement, he wrote that Bruce "was filling a cup with antifreeze doing something with it just before cops arrived."

51.     Defendant Lukens and Defendant Dragoo then split up with Defendant Dragoo leaving the residence to canvas the neighborhood for signs of Bruce. Defendant Lukens stayed behind at the residence and continued to question Cindy and Reese about Bruce's actions prior to the officers arrival. Both Cindy and Reese told Defendant Lukens that Bruce had been drinking all day and that just before officers arrived he was observed mixing milk and antifreeze into a cup. They also told Defendant Lukens that Bruce said he had drank the mixture of milk and antifreeze in an attempt to commit suicide before he fled the residence on foot. Defendant Lukens's post-arrest report noted that "[i]t was advised to officers that Mr. B. Kennon was highly intoxicated, and had possibly drank antifreeze in an attempt to threaten suicide to his family."

---

[5] The body cam footage from this arrest is adopted and incorporated herein by reference, and will be separately filed with the Court through notice of conventional filing.

52.      After the foregoing interaction with Cindy and Reese, Defendant Lukens radioed Defendant Dragoo at or around 7:00 p.m., and stated that he found a cup on the other side of the fence of the Kennon residence.

53.      At or around 7:11 p.m., Defendant Lukens and Defendant Dragoo meet outside the Kennon residence and begin walking around the neighborhood together on foot. At one point in time, Defendant Lukens and Defendant Dragoo have the following conversation:

> Defendant Lukens:     "Well I think he drank a cup of antifreeze."

> Defendant Dragoo:     "Drank a cup of antifreeze?"

> Defendant Lukens:     "That's what they say, he had antifreeze in a bottle and then he had a green cup that he poured it in and then he chugged it all and threw the cup in the back of here . . . so he, uh, he better hope we find him before the antifreeze gets in his system."

> . . .

> Defendant Dragoo:     "He ain't got a phone to call an ambulance when he needs one when it starts going bad . . . that antifreeze ain't no joke it'll kill him."

54.      Defendant Lukens and Defendant Dragoo then continue to canvas a wooded area near the Kennon residence searching for Bruce.

### Defendant Lukens and Defendant Dragoo predetermine that Bruce will not go to the hospital

55.      At or around 7:16 p.m., Defendant Dragoo tells Defendant Lukens that "we ain't gonna sit in the woods all night." After Defendant Lukens makes an unintelligible response, Defendant Dragoo then states "well the thing is if we do find him and he did drink antifreeze he's just gonna have a warrant or whatever because he's gonna, he'd be in the hospital for a while for something like that and we can't just have someone sit up there that long with him . . . ." Defendant Lukens then states "depending on much he drank too . . . ." Then Defendant Dragoo

again states "can't sit in the woods all night," and the two officers call off the search for Bruce and eventually leave in the neighborhood in patrol vehicles.

56.     The foregoing statement by Defendant Dragoo is an admission of his belief that taking an arrestee in need of emergency medical attention to jail is always preferable to taking them to a hospital. It also shows that Defendant Dragoo would have rather taken Bruce to RCDC than to have an officer sit at a hospital with Bruce. Upon information and belief, Defendant Dragoo's preference to jail as opposed to a hospital was so widely shared throughout BPD's patrol force that it had become the custom or practice of patrol officers to take arrestees in need of emergency medical care to jail instead of a hospital.

### The Individual Officer Defendants arrest Bruce and manufacture information to support their predetermined decision that Bruce would not go to the hospital

57.     A short while later, Defendant Lukens and Defendant Dragoo were dispatched to the Kennon residence for a second time when someone called 911 to report seeing Bruce in the neighborhood. The officers arrived at the Kennon residence to find that Bruce was not there, and again they left the neighborhood in their patrol vehicles.

58.     At or around 7:30 p.m., Cindy again called 911 to report that Bruce had returned to their residence and was attempting to get inside the house. Defendants Lukens, Dragoo, and Selmon were dispatched to the Kennon residence again. Then at or around 7:39 p.m., Defendant Lukens and Defendant Selmon find Bruce inside the Kennon residence, and violently throw him to the ground and arrest him.

59.     When Bruce was arrested his serious medical needs were obvious and apparent to the Individual Officer Defendants, and his need for immediate medical treatment was both obvious and required by generally accepted law enforcement standards if not BPD's own written

procedures.[6] Further, it was obvious to a lay person that Bruce was suffering from altered mental status and could not make decisions for himself.

60.     At or around 7:41 p.m., Defendant Lukens asks an obviously disoriented and impaired Bruce whether he drank antifreeze. Bruce can be heard saying "no," while Cindy is heard in the background screaming "you kept telling us you drank it." Reese can then be heard telling Defendant Lukens that the cup from which Bruce drank antifreeze was still in the backyard.

61.     While Defendant Lukens is walking Bruce from the residence to a patrol vehicle he asks Bruce again whether he drank antifreeze. An obviously impaired Bruce says it was just milk, to which Defendant Lukens responds "that solves the problem then." The problem being that the officers did not want to take Bruce to the hospital because it meant they would have to sit with him. Defendant Lukens then approaches Defendant Dragoo and tells him "they're saying he stated over and over he drank it but he's claiming it's just milk." Bruce is then placed in Defendant Dragoo's patrol vehicle.

62.     Upon information and belief, in order to avoid taking Bruce to a hospital for needed emergency care and treatment - in violation of generally accepted law enforcement standards if not BPD's own written procedures - Defendant Lukens and Defendant Dragoo agreed to write Bruce up as being intoxicated. Defendant Lukens and Defendant Dragoo did so even though they did not have the training or ability to discern between alcohol intoxication and ethylene glycol poisoning. Based on the information available to the Individual Officer Defendants at this time, and generally accepted law enforcement standards, the officers were required to seek medical intervention for Bruce.

---

[6] City Attorney for Defendant City has stone-walled the undersigned counsel's attempt to obtain BPD's written procedures claiming said procedures are protected from public disclosure as training documents.

63.     After Bruce is secured in Defendant Dragoo's vehicle, Defendant Dragoo asks Defendant Lukens "where's that cup" referring to the cup from which Bruce drank antifreeze. Defendant Lukens responds that "it's in the backyard behind this other house . . . ." Defendant Dragoo then gets in his patrol vehicle and leaves the scene with Bruce. At no point did the officers request medical assistance at the scene, and Bruce was transported from the scene without any medical assessment or medical assistance.

64.     When Defendant Dragoo asked "where's that cup" to Defendant Lukens, both officers already knew where the cup was located because Defendant Lukens had found it approximately 40 minutes earlier when he was at the Kennon residence with Bruce's son Reese. The cup had previously been found outside in the yard, turned upside down and empty. It was impossible to determine from looking at the cup what had been in it when Bruce drank from it. The information available to the officers was that Bruce had been observed pouring antifreeze and milk into the cup. The cup was found before Defendant Lukens ever stated "Well I think he drank a cup of antifreeze."

65.     At or around 7:45 p.m., after Defendant Dragoo had already left the scene in his patrol vehicle with Bruce, Defendant Lukens radios Defendant Dragoo and states "I recovered the cup . . . it's . . . it has a clear liquid in it . . . it wasn't milk but it doesn't smell like a chemical." This statement by Defendant Lukens completely contradicts the happenings of earlier that night. Said statement was manufactured to support the officers' decision not to take Bruce to the hospital. Further, said statement contradicts Defendant Lukens's post-arrest report which noted that the cup was found and appeared to have a "mixture of milk and juice" inside it. After the officers all left the Kennon residence that night, they left behind the actual cup from which Bruce had been seen mixing antifreeze and milk.

**Bruce is held by the Individual Officer Defendants for another two hours while the officers are provided with a plethora of further information showing that Bruce had drank antifreeze and was experiencing a medical emergency**

66.    Defendant Dragoo took Bruce directly to the BPD station for booking. At or around 7:53 p.m., Defendant Dragoo and Bruce arrive at the BPD station. At or around 8:06 p.m., Defendant Dragoo asks Bruce "are you the one they arrested down by the railroad tracks that day?" Bruce responded "yeah" he was. This interaction shows Defendant Dragoo's knowledge of Bruce's prior suicide attempt at the railroad tracks. Defendant Lukens also stated at one point that he dealt with Bruce in regard to the train track incident, so he knew or should have known of Bruce's prior suicidal tendencies.

67.    Bruce's mental and physical impairment rapidly deteriorated while he was at the BPD station. This included exhibiting symptoms of ethylene glycol poisoning such as slurred speech, inability to think or talk coherently, labored breathing, dilated pupils, and somnolence. Defendant Lukens's narrative in the arrest report notes that Bruce "was highly intoxicated, and struggled to follow line of questioning." Bruce, however, had denied drinking any alcohol that day other than two Dos Equis beers at lunch.

68.    At one point during booking, Defendant Lukens asks Bruce what he was drinking in the cup. Bruce responds "it was milk . . . it mighta had a little, uh, Koolaid in it." Bruce then specifies "green Koolaid." Defendant Lukens then asks Bruce "well with you being intoxicated and bleeding do you wanna be checked out by medical?" Bruce slurred "no . . . I mean I'm not hurt . . . she just hit me." Any lay person could tell that Bruce was suffering from altered mental status and incapable of making any decision for himself at this time.

69.    Shortly after the foregoing exchange, Defendant Dragoo walks into the room with Defendant Lukens and Bruce. Defendant Lukens then tells Defendant Dragoo that "I'll get him

checked out just for liability on us." Defendant Lukens's reference to "checked out" referred to

Bruce receiving medical attention. Defendant Dragoo responds that "he denied it . . . he denied

it, so he's ummm . . . ." Defendant Dragoo then quickly ends the conversation by instructing

Defendant Lukens to get pictures of Bruce's injuries.

70.     At or around 8:10 p.m., Defendant Lukens questions Cindy after she came to the

BPD station following Bruce's arrest. During this conversation, Cindy tells Defendant Lukens

that Bruce was a chronic liar who was currently on probation for credit card fraud. Cindy also

told Defendant Lukens that Bruce had previously suffered from suicidal ideations and attempts.

Cindy also told Defendant Lukens that "Bruce has serious mental trouble and it's getting worse."

71.     Bruce's mental and physical condition continued to rapidly worsened while the

Individual Officer Defendants watched on. Bruce's need for immediate medical attention was

obvious and apparent to the Individual Officer Defendants. Because they did not want to take

Bruce to the hospital, the Individual Officer Defendants deliberately ignored any information

which showed that Bruce had attempted suicide by drinking antifreeze and was in the midst of a

medical emergency. The actions of the Individual Officer Defendants were in violation of

generally accepted  law enforcement standards if not BPD's own written procedures.

72.     Defendant Lukens eventually took Bruce from the station and transported him to

RCDC. At or around 10:08 p.m., Defendant Lukens transferred Bruce into the custody of

Defendant County and RCDC. Defendant Lukens did not inform custodial officials at RCDC that

Bruce was suspected of drinking antifreeze. This was because Defendant Lukens knew if

disclosed this information then RCDC was unlikely to accept him and BPD's officers would then

be responsible for taking Bruce to the hospital.

73.    The body cam footage from this arrest is adopted and incorporated herein by reference, and will be separately filed with the Court through notice of conventional filing.[7]

**Defendant City's decision to hire Wayne Dearman as Police Chief leads to turmoil and turnover inside BPD and a young, inexperienced patrol force**

74.    The tragic events leading to Bruce's death were created and set in motion over a year prior when Defendant City's Board of Alderman hired Wayne Dearman as Police Chief on or about September 13, 2022. Chief Dearman's hiring led to BPD being overrun with unqualified, untrained, and unsupervised patrol officers, who acted under color of state law and pursuant to officially sanctioned, unconstitutional policies and practices.

75.    Prior to being hired as Defendant City's Police Chief, Chief Dearman held various roles within the Mississippi Department of Public Safety (hereinafter "MPDS"). A glaring omission in Chief Dearman's resume was prior experience in municipal law enforcement. Chief Dearman also lacked prior command time and leadership roles. It was obvious from Chief Dearman's resume that he was unqualified to serve as Police Chief.

76.    One of Chief Dearman's first actions as Police Chief was to hire Marshall Pack as Assistant Police Chief. Assistant Chief Pack was hired on or about November 10, 2022. Like Chief Dearman, Assistant Chief Pack's resume was void of command time and he had little to no experience in municipal law enforcement. Assistant Chief Pack had previously been fired twice by MDPS. Pack was fired from MDPS in October 1995 for having sex with a confidential informant. After being reinstated, Assistant Chief Pack was again terminated by MDPS in December 2001 for (1) seizing cash from a potential target without accounting for the seizure,

---

[7] Defendant Lukens was not wearing his body worn camera at the scene of Bruce's arrest. Defendant Lukens at one point admitted to another officer that he had left his body worn camera at the station because he was unfamiliar with BPD's policy that body worn cameras are to be worn and recording at all times during an arrest.

(2) participating in sexually explicit behaviour during a vacation in Florida, and (3) observing but not reporting illegal drug activity during said vacation.

77.    Chief Dearman and Assistant Chief Pack were unqualified and unfit to serve in their respective roles. Despite being unqualified and unfit, these two individuals were bestowed with the highest law enforcement authority possible within BPD.

78.    Chief Dearman's tenure at BPD was plagued with intra-department turmoil and near constant turnover of police officers. Between October 2022 and November 2023, BPD had at least 27 full-time officers and 5 reserve officers quit or resign.

79.    By November 2023, BPD only had 14 patrol officers, 2 patrol supervisors, and 2 part-time or reserve patrol officers on staff. The number of patrol officers and supervisors on staff at BPD at this time was woefully inadequate when compared to surrounding municipalities with comparable populations.

80.    The turnover and understaffing within BPD led to a patrol force that was largely made up of young, inexperienced and unsupervised patrol officers. Of the fourteen full time patrol officers on staff at BPD in November 2023, nine were either trainees or recent graduates of the law enforcement training academy. These nine included Defendants Lukens, who was just 19 years old when he was the primary officer for Bruce's arrest on December 3, 2023. These nine also included Defendant Selmon. Defendant Dragoo barely had more experience than Defendant Lukens and Defendant Selmon, but was one of the more senior officers on the patrol force.

81.    Turnover amongst more senior patrol officers, along with a lack of leadership stemming from Chief Dearman and Assistant Chief Pack, meant that BPD's inexperienced patrol force went unsupervised and untrained. Often these unsupervised and untrained patrol officers were patrolling Defendant City's streets without knowledge or training as to BPD's own policies

and procedures. This was evident in Defendant Lukens's arrest of Bruce, as Defendant Lukens did not even know BPD's procedure for wearing body worn cameras.

### Chief Dearman is fired and Defendant City's deliberate indifference to the Constitutional rights of its citizens continues under the new regime

82.    The turmoil and lack of leadership within BPD became so widespread and severe that Chief Dearman was eventually fired after just 14 months on the job.

83.    On or about November 7, 2023, Chief Dearman tendered his resignation as Police Chief for BPD.

84.    On or about November 8, 2023, Defendant City's Board of Alderman held an executive session wherein the board terminated Chief Dearman in lieu of his resignation. The meeting minutes from this session state that Chief Dearman had tendered his resignation in order to avoid an ongoing investigation and termination.

85.    Also on or about November 8, 2023, Defendant City's Board of Alderman hired Joseph French to replace Dearman as Chief of Police.

86.    By this time the problems and issues within BPD were so widespread and engrained that they could not be immediately corrected. Even after Chief Dearman was fired, Defendant City and Chief French continued to place a young, inexperienced patrol force on Defendant City's streets without proper training and supervision. BPD also continued to have an unusually high turnover rate with three patrol officers and Assistant Chief Pack resigning in the month of December 2023. Another patrol officer was moved to administration duties during the month of December 2023.

87.    By the time Chief Dearman was fired, there was a deeply ingrained policy or custom of denying arrestees and detainees necessary medical care based on BPD's staffing and manpower at the time of arrest. This practice or custom continued well after Chief Dearman was

fired, and it was evident during Bruce's arrest when the arresting officers decided that Bruce

could not go to the hospital because they did not want to spare an officer to sit with him.

**FACTUAL ALLEGATIONS PERTAINING TO
DEFENDANT COUNTY, DEFENDANT VITALCORE, THE INDIVIDUAL JAILER
DEFENDANTS, AND DEFENDANT LAGO**

**When Bruce arrives at RCDC he cannot sit, stand, or dress himself, and he is suffering
from obvious altered mental status**

88.     By the time Bruce arrived at RCDC he was exhibiting obvious signs of a medical

emergency. Among other physical signs and symptoms, Bruce could not walk or stand without

assistance, his speech was severely slurred and incoherent, and he could not even dress himself.

89.     Defendant Johnson noted in the booking report that when he went to retrieve

Bruce from the sally port he "could tell the inmate was drunk he could barely walk and stand

up." Defendant Johnson also stated he "got [Bruce] in to booking Sgt White J70 came in to help

me with the situation and Officer Brady J66 took the inmate into dress out room to dress him

out."

90.     The booking video shows that Bruce could not stand up without support by a

jailer. The video also shows that the jailers did not question Bruce as to whether he had anything

to drink that night or if he was otherwise under the influence of alcohol or drugs. At one point

one of the jailers tells Bruce "we'll bring the nurse in here to look at you okay."

**Defendant Lago, LPN, looks Bruce over for about a minute before deeming him fit to be
booked and jailed**

91.     A few minutes after a jailer tells Bruce that the nurse will look at him, Defendant

Lago, an employee of Defendant VitalCore, walks into the room where Bruce is being booked.

Defendant Lago states to Bruce "weren't you just in here," referring to Bruce's prior

incarceration at RCDC in September 2023 when he was "highly suicidal." Defendant Lago had previously seen and treated Bruce while he was jailed at RCDC in September 2023.

92.    Defendant Lago then states to Bruce "Oh Lord you been drinking too . . . you're drunker than Cooter Brown." Bruce through slurred and delayed speech responds "No I have not" and tries to keep speaking but cannot coherently do so. Defendant Lago then asks Bruce "What'd you drink motor oil because you're as drunk as Cooter Brown." She did wait for Bruce to answer the question, and Bruce was incapable of doing so at the time. Instead, Defendant Lago just walked away from Bruce without any further assessment.

93.    A Body Chart completed by Defendant Lago noted that Bruce was "extremely intoxicated." Generally accepted jail standards, if not Defendant Vitalcore's own written procedures, require that persons presenting as extremely intoxicated be immediately referred for care and medical clearance into the facility. However, Defendant Lago did not refer Bruce for care or medical clearance.

94.    Further, Defendant Lago, obviously realizing that Bruce's condition could be the result of something other than alcohol consumption, made no attempt whatsoever to determine what Bruce had drunk. Her entire interaction with Bruce lasted approximately a minute and consisted of a rudimentary look at Bruce's cuts and scrapes. She did not take Bruce's vital signs. She did not question Bruce as to whether he had taken any alcohol or drugs. She did not ask Bruce about any medical conditions. Although she had dealt with Bruce just a few months before when he was "very suicidal," she did not ask Bruce whether he was suicidal at this time.

95.    Upon information and belief, Defendant Lago was the only medical staff at RCDC at the time Bruce was received. Defendant Lago was a Licensed Practical Nurse, i.e.,

LPN. As a matter of Mississippi law, and the generally accepted standard of care, an LPN is not competent or permitted by licensure to conduct an intake medical health assessment.

96.    Other than Defendant Lago, Bruce was not seen by any medical staff at RCDC prior to being accepted into the facility and thrown into a jail cell.

### Bruce's physical condition has become so bad that booking officers literally have to hold him up to complete booking

97.    After Defendant Lago looked at Bruce for about a minute, Bruce was taken to be dressed out. Defendant Johnson noted in the booking report that he decided "to put [Bruce] in male Detox to let him rest a little so he could sober up a little before I booked him in." Defendant Johnson then noted that he "called Sgt White and asked him do I need to fully book him in or just dry book right now and he told me if I can fully book him in then do it."

98.    The booking notes show that Defendant Johnson then "went in there got [Bruce] up helped him to the desk and at this point he still couldn't barely walk nor stand up on his own." Defendant Johnson noted that he "held on to [Bruce] while Officer Watts J55 did the booking and we were able to get him fully booked in and put on 24 hour observation in 214/137."

99.    Bruce's condition at this time was such that it would have been impossible for him to comprehend or answer the questions necessary to complete intake and booking. Yet, somehow at 10:20 p.m. the Booking Medical Sheet was completed by Defendant Watts. Defendant Watts marked "No" for the question "Does the inmate have any visible signs of trauma, illness, obvious pain or bleeding, requiring immediate medical attention?" The officer marked "Yes" for the question "Does inmate appear to be under the influence of drugs or alcohol?"

100.    Another booking sheet was completed approximately 30 minutes later at or around 10:50 p.m., and it shows that Bruce was placed on 24-hour observation for being "very

intoxicated." Yet another booking sheet completed that night noted that Bruce was "extremely intoxicated." It is not clear at this time which booking officers and/or medical officers completed the aforementioned booking sheets.

101.    Records show that after Bruce was booked into the jail "Officer Brady White helped escort him to his cell safely and secure."

102.    As stated herein above, generally accepted jail standards, if not the written procedures of both Defendant County and Defendant VitalCore, require that persons presenting with symptoms of a serious medical condition, including being extremely intoxicated, be immediately referred for care and medical clearance into the facility. Bruce was not referred for care or medical clearance even though it was noted multiple times by jailers and medical staff that Bruce was extremely intoxicated.

103.    Even if jailers and medical staff lacked knowledge that Bruce had drank antifreeze, given Bruce's condition he still should have been referred to a qualified, higher-level medical provider for care and medical assessment. Had this been done then Bruce's life very well could have been saved.

**Defendant County's jailers watch on and do nothing as Bruce lies unconscious on the floor of a cell in a puddle of urine for over sever hours**

104.    According to RCDC records, Bruce was placed in a cell for 24-hour observation at or around 10:50 p.m. on December 3, 2023. Sometime just before 6:00 a.m. the next morning, Defendant White found Bruce unresponsive lying face down on the floor of his cell.

105.    The occurrences in Bruce's cell between 10:50 p.m. December 3, 2023, and 6:00 a.m. December 4, 2023, remains unknown. Counsel for Defendant County claims the video

footage from this time period no longer exists.[8] Upon information and belief, Defendant County purposefully failed to retain the video footage.

106.    A Jail Incident Report made subsequent to Bruce being found unresponsive on the morning of December 4 contains self-serving, contradictory statements as to the events that occurred in Bruce's cell from the night of December 3 until the morning of December 4.

107.    Defendant Hildesheim's entry in said report notes that Defendant White checked on Bruce multiple times during the time frame in question after he was observed lying on the floor of his cell. Specially:

---

Date/Time Entered:    12/04/2023 07:20:20          Entered By: HILDESHEIM, TOMMY

Hildesheim Report

On the date above at approximately 0600 Hrs. I, Officer Hildesheim was the acting Sgt when the following occurred. Approximately 2230 Hrs. Brandon Police DEpartment brought in Inmate Kennon Bruce for Aggravated Domestic. After he was fully boked in he was brought back to his cell in Central 214 cell 137 on camera due to him beening really intoxicated. While I, Sgt Hildesheim was reviewing the cameras I, seen Inmate Kennon laying on the floor. I, Sgt. Hildesheim had Officer White , Brady to go check on him to see if he was ok. After Officer White check on him he responded back to me and told me he was ok and was breathing. After seeing him on the floor a while later I had Officer White to recheck on him again he stated he was sleeping breathing and snoring. While feeding Officer White called me via radio to come to Central Pod 214 to cell 137 and check on him for him. We both walked in at that time I, Sgt Hitdesheim noticied he was in destress and had Officer White to go get Nurse Vickie. She arrived a short time latter and checked his vitals which did come back normal but his pulse was a little high. She stated he needed to go to the hospital by ambulance. I, Sgt Hildesheim notified Booking via radio to get Brandon Fire and Patford in route.Brandon Fire arrived at 0609 and Pratford arrived at 0610 Hrs. I, Sgt Hildesheim turned the scene over to Brandon Fire and Pratford. At 0620 Brandon Fire left the scene and at 0626 Pratford 451 left the scene at 0626 with J39 and J66.

---

108.    Defendant White's entry in the Jail Incident Report makes no mention of checking on Bruce until approximately 5:50 a.m. on the morning of December 4 and only after Bruce failed to come get food that Defendant White was serving. Specifically:

---

Date/Time Entered:    12/04/2023 11:59:29          Entered By: BARBER, KRISTIE

Brady White Report

On 12/04/2023 at approximately 0550hrs. I, Officer Brady White was working as the upstairs floor walker when I started feeding in pod 214 when I noticed inmate Bruce Kennon was on the floor and not coming to the cell door to get his food, I called for acting sergeant at the time Officer Tommy Hildesheim J56 to come to pod 214-137 for a possible medical emergency. We had Central pop the cell door to see what was going on with inmate Kennon, he was not responding to us, so I want to get the nurse when the nurse got there she had us roll him on his back to check his vitals. She stated that we needed to get Pafford enroute. I went to Booking to let Booking know to get Pafford enroute for a unresponsive inmate. Shortly after Pafford 451 and Brendon fire showed up on scene and they loaded him up on the ambulance. Officer Anthony Fox J39 and I rode in the ambulance to River Oaks Hospital.

---

[8] The Jail Incident Report notes that Lt. Thompson was supposed to save the video footage of the incident. However, it is apparent that Lt. Thompson did not retain the entire video footage from Bruce's cell as there are over 7 hours of footage missing. The 7 hours of missing footage consists of the time Bruce was placed in his cell to the time Defendant White found him the next morning.

*Original Complaint and Jury Demand*

109.    Upon information and belief, Defendant White and Defendant Hildesheim intentionally wrote the foregoing self-serving narratives in a manner which would hide their own culpability.

110.    After Bruce was found unconscious, Defendant Lago came to Bruce's cell and checked his vital signs. This was the first time anyone checked Bruce's vital signs since his arrival at RCDC. At some point thereafter, an Offsite Emergency Referral Form was completed which reflects Bruce having an elevated blood pressure, pulse, and respiratory rate. Bruce had also at some point urinated on himself.



111.    At some point after Defendant Lago performed the vital check, Brandon Fire Department and Pafford EMS were dispatched to RCDC.

112.    At or around 6:26 a.m., Bruce left RCDC with Pafford EMS to be transported to Merit Health River Oaks. At or around 6:46 a.m., Bruce was transferred into the care of Merit Health River Oaks.

113.    At this point, it had been over twelve hours since Bruce had drank antifreeze.

114.    The available video footage of Bruce's booking at RCDC is adopted and incorporated herein by reference, and will be separately filed with the Court through notice of conventional filing.

### Defendant County's reputation for killing people

115.    Sheriff Bailey is and was at all relevant times the elected Sheriff of Defendant County and the final policymaking authority for RCSO.

116.    RCSO's reputation for violence and unconstitutional practices under Sheriff Bailey's tenure are well known to the public and this Court. On November 30, 2023, just a few days before Bruce was jailed at RCDC, *The New York Times* published an article detailing the newspaper's investigation into RCSO which was done in conjunction with the Mississippi Center for Investigative Reporting at Mississippi Today.[9] The reporters conducting the investigation examined hundreds of pages of court records and sheriff's office reporters and interviewed  more than 50 people claiming they witnessed or experienced torture at the hands of RCSO. The article claims that what emerged "was a pattern of violence that was neither confined to a small group of deputies nor hidden from department leaders."

117.    The violent acts and unconstitutional practices of RCSO deputies and employees are so perverse and blatant, that they triggered a federal investigation by the Department of Justice. Specifically, on September 19, 2024, the Department of Justice opened an ongoing civil pattern or practice investigation into Defendant County and the RCSO, with said investigation focusing on the RCSO's policies, training, supervision. The investigation is also looking into the RCSO's system of accountability.

---

[9] Brian Howey and Nate Rosenfield, *How a 'Goon Squad' of Deputies Got Away With Years of Brutality*, The New York Times, https://www.nytimes.com/2023/11/30/us/rankin-county-mississippi-sheriff.html (last updated March 23, 2025).

118.    RCSO is perhaps most well known for the reprehensible and disgusting acts of six deputies known as "the Goon Squad." However, it is also known for a high number of deaths occurring to inmates and detainees being held at RCDC.

119.    In 2020, a man named Brian Christopher Ray died by suicide in RCDC. Jailers first put Ray in a "segregation pod" to comply with COVID-19 protocols. A few days later the jailers moved Ray to a different cell where he was supposed to be on 24-hour surveillance due to being on medical watch for drug withdrawal. Ray then attempted to hang himself in the jail shower but was unsuccessful as the apparatus he used collapsed under his weight. RCDC jailers and staff failed to notify medical personnel or request emergency medical care for Ray, nor did they place Ray on suicide watch.

120.    Later the same night, Ray attempted to hang himself again. This time it took jailers and RCDC staff over forty-four minutes to respond. Ray later died after being transported to a hospital. In the aftermath of Ray's death, Sheriff Bailey and RCDC's jailers were accused of providing false information and attempting to cover up their role in the death. Defendant Hildesheim, the jailer that was supposed to be monitoring Bruce on the night he lay face down and unconscious on the floor of his cell for over seven hours, was also named as a defendant in a lawsuit filed by Ray's family.

121.    In 2021, a man named Cory Jackson died in custody at RCDC after being arrested by RCSO deputies earlier that day. Earlier in the day Jackson was hallucinating and screaming that we saw snakes while stabbing the floorboard of the car he was in with a letter opener.[10] Jackson's sister was taking him to the hospital when Jackson happened to jump out of the car and flee just as RCSO deputies drove by.

---

[10] Cindy incorporates by reference the pleadings in the case before this Court concerning the death Coker, *Joyce Reddell et al. v. Rankin County et al.*, 3:24-cv-264-KHJ-MTP, as if fully stated herein.

122.    As RCSO deputies were arresting Jackson, his sister jumped out of the car and started begging the deputies to not hurt him because he was hallucinating and in need of medical assistance. The deputies arrested Jackson, and after Pafford EMS refused to take Jackson because he was too violent, the deputies took Jackson to RCDC as opposed to a hospital. At RCDC, Jackson was denied emergency medical care and instead tied to a restraint chair where he violently thrashed around for over an hour before becoming unresponsive. RCDC custodial officers and jailers watched on and did nothing. Jackson eventually died as a result of being denied medical care at RCDC.

123.    Yet again in 2021, a man named Adam Blake Coker died while in custody at RCDC.[11] Video footage from Coker's cell at RCDC showed him pacing around the cell for hours while vomiting several times and incessantly begging jailers for help. Despite this, Coker's records note that he was in "no acute medical distress" despite jail nurses observing chills, nausea, increasing pain, loose stool, and red marks on his scan. Coker eventually died of a ruptured appendix as jailers and nursing staff watched on and did nothing.

124.    Deaths connected to RCSO and RCDC have continued to pile up since Coker's death, including Bruce's death in 2023. The deaths of Ray, Jackson, Coker, and Bruce are eerily similar with a common theme running throughout: they all involve the callous, cold indifference of RCDC's custodial officials, jailers, and medical staff to the emergency medical needs of detainees and inmates.

125.    Just last year in 2024, yet another death was reported at RCDC when an inmate died of a suspected suicide. The number of deaths occuring to people in RCSO's custody spurred

---

[11] Cindy incorporates by reference the pleadings in the case before this Court concerning the death Coker, *Coker et al. v. Bailey et al.*, 3:24-cv-555-DPJ-ASH, as if fully stated herein.

the mother of one such victim to publicly declare that RCSO "has a reputation for killing people."

126.    The fact that deaths are still continuing at RCDC shows that, despite notice to Defendant County and Sheriff Bailey that change is needed as to the RCSO's practices and its training, supervision, and discipline of custodial officers, jailers, and medical staff, no change has occurred. Sheriff Bailey has done nothing to change RCSO's deep-rooted problems,  despite overwhelming evidence that change is needed. In fact, Sheriff Bailey has shown his own deliberate indifference to the problems in public comments addressing the situation; at one point stating "I have 240 employees, there's no way I can be with them each and every day."

127.    Some of Defendant County's public officials have likewise recently shown their own cold, deliberate indifference to the severe problems within RCSO. Specifically, after Defendant County recently announced a $2.5 million dollar settlement with two of the Goon Squad's victims, Rankin County Supervisor Steve Gaines publicly stated in regard to the County's attorney, he "beat the pants off of those guys — the dopers, the people that raped and doped your daughters. He beat their pants off." This statement shows how deep the problem runs within Defendant County.

### The constitutionally deficient practices employed by Defendant County and Defendant VitalCore at RCDC, including their foreseeably dangerous "wait and see" approach to medical care

128.    RCSO is only part of the problem at RCDC and the ongoing practice of denying detainees and inmates necessary and proper medical care. Defendant VitalCore is also to blame.

129.    At all times relevant to the subject matter of this Complaint, Defendant County contracted with Defendant VitalCore to provide medical care and services to detainees at RCDC, as well as medical personnel.

130.    Defendant County and its private contracted medical provider, Defendant VitalCore, have at all relevant times, with deliberate indifference to the rights of people who are jailed at RCDC, persistently maintained constitutionally deficient policies, customs, and practices with respect to the provision of medical care at RCDC.

131.    The constitutionally deficient policies, customs, and practices employed by Defendant County and Defendant VitalCore include their failure to properly train, supervise, and discipline custodial officers and medical staff at RCDC. This includes said Defendants' failure to train, supervise, and discipline custodial officers and medical staff regarding the need to provide timely medical care by an appropriate level medical care provider. It also includes their failure to train, supervise, and discipline custodial officers and medical staff on when potential inmates should be referred for care and medical clearance prior to being accepted into RCDC.

132.    Generally accepted industry standards, and upon information and belief the written procedures of both Defendant County and Defendant VitalCore, require that reception personnel ensure that persons presenting to the jail with serious and potentially emergent symptoms be referred immediately for care and medical clearance into RCDC. As opposed to the generally accepted standard, Defendant County and Defendant VitalCore employ a dangerous "wait and see" approach whereby detainees and inmates presenting with serious and potentially emergent symptoms are denied immediate medical care and instead thrown into a cell to wait and see what happens. As is seen in Bruce's situation, and that of Ray, Jackson, and Coker, the custodial officers and medical staff often wait to act until it is too late for emergency medical intervention.

133.    Alongside their policy and custom of taking a reckless wait and see approach to medical care, Defendant County and Defendant VitalCore were on notice that they had numerous

additional practices and/or customs that were constitutionally deficient. Upon information and belief, said practices and/or customs include, but are not limited to, the following:

a. Failure to screen detainees and inmates for medical issues prior to acceptance into RCDC;

b. Inadequate training and supervision for intake personnel as to when an arriving inmate must be immediately referred to a medical provider for evaluation;

c. Inadequate training and supervision for personnel as to when they are required to escalate a medical situation to an appropriate, higher-level provider;

d. Inadequate and improper training in recognizing and responding to medical emergencies;

e. Understaffing of custodial officers, jailers, and medical staff, and hiring said persons with little to no training or supervision;

f. Failure to implement proper procedures regarding medical screening and acceptance into RCDC;

g. Failure to follow written procedures regarding medical screening and acceptance into RCDC;

h. Failure to conduct adequate medical screening during booking;

i. Failure to promptly respond to medical emergencies;

j. Failure to promptly provide reasonable medical care and treatment, including off-site referrals;

k. Failure to train, supervise, and discipline personnel;

l. Ignoring medical emergencies;

m.  Inadequate and improper procedures, policies, and practices for investigating improper activities by personnel;

n.  Inadequate and improper procedures, policies, and practices for identifying and taking appropriate action against personnel who need retraining, corrective measures, reassignment, or other non-disciplinary actions through a positive or early warning system designed to prevent the violation of constitutional rights;

o.  Failure to recognize the severity of symptoms or otherwise dismissing the severity of symptoms suggesting a medical emergency;

p.  Failure to follow established policies and procedures for responding to inmates with medical emergencies, leading to a delay in accessing appropriate medical care.

134.  The aforementioned practices and/or customs, though possibly not formally adopted, had become so widespread, well-settled, and deeply entrenched in their application, use, employment, and acceptance in the jail to have become official policies of Defendant County and Defendant VitalCore.

135.  Defendant County and Defendant VitalCore were on notice that at least the constitutionally deficient policies, practices, and customs described herein existed before Bruce's incarceration on the night of December 3, 2023.

136.  With deliberate indifference, Defendant County and Defendant VitalCore nonetheless permitted these policies, practices, and customs to persist at all times relevant hereto.

137.  The constitutionally deficient policies, practices, and customs described herein were the moving force behind the constitutional violations Bruce suffered.

## CAUSES OF ACTION

### Count I
### 42 U.S.C. § 1983 and Violation of the Fourteenth Amendment - Deliberate Indifference to Serious Medical Needs

**(Individual Officer Defendants[12] and John and Jane Does 1-5)**

138.    Cindy incorporates herein each and every preceding paragraph as if fully set forth herein.

139.    The acts and omissions of the Individual Officer Defendants identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs in violation of the Fourteenth Amendment to the United States Constitution.

140.    The conduct by the Individual Officer Defendants identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs as defined by clearly established law.

141.    At all relevant times, the Individual Officer Defendants were acting under color of state law, as agents of Defendant City, and within the scope of their employment and authority as a patrol officer with Defendant City.

142.    The objective indicia available to the Individual Officer Defendants were so obvious that even a layperson would have recognized Bruce required immediate medical attention.

143.    Every reasonable patrol officer would have known that Bruce objectively required medical attention with information available to the Individual Officer Defendants.

144.    Even a layperson would have known that Bruce was suffering from several serious medical needs and necessitated medical treatment.

---

[12] Individual Officer Defendants refers to Defendant Lukens, Defendant Dragoo, and Defendant Selmon.

145.    The Individual Officer Defendants failed to seek medical attention for Bruce at the scene of his arrest.

146.    The Individual Officer Defendants failed to transport Bruce to a hospital

147.    Every reasonable patrol officer would have known that it was deliberately indifferent to fail to provide medical treatment in the face of such easily recognizable and serious medical conditions.

148.    The Individual Officer Defendants were deliberately indifferent in denying Bruce appropriate medical care that was obviously necessary.

149.    The Individual Officer Defendants' failure to summon medical attention to Bruce or transport him to a hospital after he was in a critical medical condition was deliberately indifferent and violated clearly established law.

150.    As a direct and proximate result of the Individual Officer Defendants' deliberate indifference to serious medical needs, Bruce experienced catastrophic personal injuries and death.

151.    As a direct and proximate result of the Individual Officer Defendants' deliberate indifference to serious medical needs, Bruce experienced catastrophic conscious pain, suffering, and emotional distress.

152.    As a direct and proximate result of the Individual Officer Defendants' deliberate indifference to serious medical needs, Bruce eventually died of his injuries.

153.    As a direct and proximate result of the Individual Officer Defendants' deliberate indifference to serious medical needs, Bruce suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

154.     Punitive damages are available against the Individual Officer Defendants as a matter of federal common law and are hereby sought by Cindy.

155.     Alternatively, should it be found that any of the Individual Officer Defendants did not directly participate in denying Bruce medical attention care, then this claim is asserted against said defendant(s) under supervisory and/or bystander liability.

**Count II**
**42 U.S.C. § 1983 and *Monell* Liability - Failure to Train**

**(Defendant City)**

156.     Cindy incorporates herein each and every preceding paragraph as if fully set forth herein.

157.     The Chief of Police or Police Chief of BPD, is the official with policymaking authority for Defendant City regarding policing and police policies and practices.

158.     The actions and inactions of the Police Chief, taken in their official capacity, are those of Defendant City.

159.     Defendant City, through BPD and its Chief, had a duty to train its police officers on the constitutional bounds of their policing duties as well as on the predictable and foreseeable situations they would encounter that would implicate the Constitutional rights of citizens.

160.     Defendant City was aware that it had placed inexperienced officers on the patrol force with the departure of older members of the force.

161.     Defendant City was aware that it did not have enough senior staff members training the new officers.

162.     Defendant City was aware that rookie and otherwise inexperienced or unqualified officers were placed on patrol when they had no business serving and were bound to violate the constitutional rights of citizens without proper training and guidance.

163.    Defendant City had a widespread practice or custom of failing to train its patrol officers in the common, routine, and foreseeable tasks that such officers had to perform including but not limited to, identifying, assessing, and responding to emergency medical situations for those in custody.

164.    Defendant City's failure to train in the aforementioned areas was so permanent, well-settled, widespread, and commonly accepted that it constituted an official custom or policy.

165.    Defendant City was consciously aware and on notice of this pattern of failures, but continued to allow untrained, inexperienced officers to patrol the streets.

166.    Defendant City was deliberately indifferent to the consequences of their failures to train and to civil rights violations that were obvious, predictable, and readily foreseeable as a result.

167.    Alternatively, even without widespread practice, Defendant City failed to equip its patrol officers with the training to handle situations that were bound to occur during the course of their specific job responsibilities.

168.    The need for training patrol officers on the constitutional bounds of their jobs was so obvious that Defendant City knew that if training was not provided, then it was highly predictable and likely to result in the violation of citizens' constitutional rights.

169.    Had Defendant City trained its patrol officers in the areas alleged herein, it would have prevented the violation of Bruce's constitutional rights.

170.    Defendant City's failure to train its patrol officers in the areas alleged herein, was the moving force behind the violations to Bruce's constitutional rights, Bruce's injuries, and Bruce's death.

171.    Bruce's injuries and death were a highly predictable consequence of Defendant City's failure to train its officers in the areas alleged herein.

172.    Bruce's injuries and death were a direct, foreseeable, and proximate result of Defendant City's failure to train its patrol officers in the areas alleged herein.

173.    As a direct and proximate result of Defendant City's failure to train its patrol officers in the areas alleged herein, Bruce suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

174.    As a direct and proximate result of Defendant City's failure to train its patrol officers in the areas alleged herein, Bruce suffered catastrophic pain, suffering, emotional distress, anguish, personal injuries, and death.

175.    As a direct and proximate result of the acts described in this Count, Bruce's next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

176.    Cindy is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### Count III
### 42 U.S.C. § 1983 and *Monell* Liability - Failure to Supervise

**(Defendant City)**

177.    Cindy incorporates herein each and every preceding paragraph as if fully set forth herein.

178.    The Chief of Police or Police Chief of BPD, is the official with policymaking authority for Defendant City regarding policing and police policies and practices.

179.    The actions and inactions of the Police Chief, taken in their official capacity, are those of Defendant City.

180.    Defendant City, through BPD and its Chief, had a duty to supervise its police officers on the constitutional bounds of their jobs. Specifically, Defendant City had a duty to supervise members of its patrol force to ensure the constitutionality of their conduct in situations where they would predictably and foreseeably implicate the constitutional rights of citizens.

181.    Defendant City was aware that it did not have enough senior staff members supervising new officers.

182.    Defendant City was aware that rookie and inexperienced officers were being placed on patrol without adequate supervision and despite their lack of qualifications, training, and experience.

183.    Defendant City had a widespread practice or custom of failing to supervise its patrol officers concerning the tasks that officers had to perform including but not limited to, identifying, assessing, and responding to emergency medical situations for those in custody.

184.    Defendant City maintained a widespread practice or custom of failing to supervise its patrol officers in situations where they would predictably and foreseeably implicate or infringe upon the constitutional rights of citizens.

185.    Defendant City's failure to supervise its patrol officers was so well-settled, widespread, and commonly accepted that it, in effect, constituted an official custom or policy.

186.    Defendant City was consciously aware and on notice of this pattern of failures but continued to allow its young, inexperienced patrol officers to operate unsupervised.

187.    Defendant City was deliberately indifferent to the consequences of their failures to supervise and the civil rights violations that were obvious, predictable, and readily foreseeable as a result.

188.    Alternatively, even without widespread practice, Defendant City failed to supervise its patrol officers to such a degree and in such areas that would obviously, predictably, and foreseeably implicate the constitutional rights of citizens on a daily basis.

189.    The need for supervision of those officers was so obvious that Defendant City knew that, if not provided, it was highly predictable and likely to result in the violation of constitutional rights.

190.    Defendant City's proper supervision of its patrol officers would have prevented the violation of Bruce's constitutional rights.

191.    Defendant City was consciously aware and on notice of these failures but continued to allow its young, inexperienced patrol officers to operate unsupervised.

192.    Defendant City was deliberately indifferent to the consequences of their failures to supervise and the civil rights violations that were predictable and readily foreseeable as a result.

193.    Defendant City's failure to supervise patrol officers was constitutionally inadequate and deliberately indifferent.

194.    Despite this knowledge and awareness, Defendant City failed to supervise its patrol officers at the expense of the constitutional rights of its citizens.

195.    Defendant City's failure to supervise its patrol officers was the moving force behind the violation to Bruce's constitutional rights, Bruce's injuries, and Bruce's death.

196.    Bruce's injuries and death were a highly predictable consequence of the Defendant City's failure to supervise its patrol officers.

197.    Bruce's injuries and death were a direct, foreseeable, and proximate result of Defendant City's failure to supervise its patrol officers.

198.    As a direct and proximate result of Defendant City's failure to supervise its patrol officers, Bruce suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

199.    As a direct and proximate result of Defendant City's failure to supervise its patrol officers, Bruce suffered catastrophic pain, suffering, emotional distress, anguish, personal injuries, and death.

200.    As a direct and proximate result of the acts described in this Count, Bruce's next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

201.    Cindy is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

<u>**Count IV**</u>
<u>**42 U.S.C. § 1983 and *Monell* Liability - Official Policy or Custom**</u>

**(Defendant City)**

202.    Cindy incorporates herein each and every preceding paragraph as if fully set forth herein.

203.    The Chief of Police or Police Chief of BPD, is the official with policymaking authority for Defendant City regarding policing and police policies and practices.

204.    The actions and inactions of the Police Chief, taken in their official capacity, are those of Defendant City.

205.    Defendant City and its Chief authorized its patrol officers to deny medical care to those in custody, including authorizing its patrol officers to take arrestees suffering from emergency medical conditions to jail as opposed to a hospital, in complete disregard of the United States Constitution and the Fourteenth Amendment.

206.    Defendant City's authorization to its patrol officers to disregard and violate the constitutional and Fourteenth Amendment rights of citizens constituted an official policy of Defendant City.

207.    Defendant City's authorization to patrol officers to disregard and violate the constitutional and Fourteenth Amendment rights of citizens was maintained with deliberate indifference to and at the expense of the constitutional rights of citizens.

208.    Defendant City's authorization to patrol officers to disregard and violate the constitutional and Fourteenth Amendment rights of citizens was the moving force behind the violations to Bruce's constitutional rights, Bruce's injuries, and Bruce's death.

209.    Bruce's injuries and death were a direct, foreseeable, and proximate result of Defendant City's authorization to patrol officers to disregard and violate the constitutional and Fourteenth Amendment rights of citizens.

210.    The violation of Bruce's constitutional right to adequate medical care was a direct, foreseeable, and proximate result of Defendant City's authorization to patrol officers to disregard and violate the constitutional and Fourteenth Amendment rights of citizens.

211.    As a direct and proximate result of Defendant City's authorization to patrol officers to disregard and violate the constitutional and Fourteenth Amendment rights of citizens,

*Original Complaint and Jury Demand*                                    45 of 65

Bruce suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

212.    As a direct and proximate result of Defendant City's authorization to patrol officers to disregard and violate the constitutional and Fourteenth Amendment rights of citizens, Bruce suffered catastrophic pain, suffering, emotional distress, anguish, personal injuries, and death.

213.    As a direct and proximate result of the acts described in this Count, Bruce's next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

214.    Cindy is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

**Count V**
**42 U.S.C. § 1983 and *Monell* Liability - Custom of Tolerance**

**(Defendant City)**

215.    Cindy incorporates herein each and every preceding paragraph as if fully set forth herein.

216.    The Chief of Police or Police Chief of BPD, is the official with policymaking authority for Defendant City regarding policing and police policies and practices.

217.    The actions and inactions of the Police Chief, taken in their official capacity, are those of Defendant City.

218.    Prior to the time of Bruce's arrest and the violation of his constitutional rights, Defendant City, through BPD, maintained a custom of tolerance for its patrol officers to deny

medical care to those in custody, including authorizing its patrol officers to take arrestees suffering from emergency medical conditions to jail as opposed to a hospital.

219.    Defendant City's custom of tolerance for its patrol officers to deny medical care to those in custody, including authorizing its patrol officers to take arrestees suffering from emergency medical conditions to jail as opposed to a hospital, was so permanent, well-settled, widespread, and commonly accepted within BPD as to constitute and carry with it the force of law.

220.    Defendant City was consciously aware and on notice that their custom of tolerance for its patrol officers to deny medical care to those in custody, including authorizing its patrol officers to take arrestees suffering from emergency medical conditions to jail as opposed to a hospital, was unconstitutional and would lead to the violation of the Fourteenth Amendment by its patrol officers.

221.    Despite this awareness and knowledge, Defendant City maintained this custom of tolerance for its patrol officers to deny medical care to those in custody, including authorizing its patrol officers to take arrestees suffering from emergency medical conditions to jail as opposed to a hospital, with deliberate indifference to and at the expense of the constitutional rights of its citizens

222.    Defendant City's custom of tolerance for its patrol officers to deny medical care to those in custody, including authorizing its patrol officers to take arrestees suffering from emergency medical conditions to jail as opposed to a hospital, was the moving force behind the violations to Bruce's constitutional rights, Bruce's injuries, and Bruce's death.

223.    Bruce's injuries and death were a direct, foreseeable, and proximate result of the Defendant City's custom of tolerance for its patrol officers to deny medical care to those in

custody, including authorizing its patrol officers to take arrestees suffering from emergency medical conditions to jail as opposed to a hospital.

224.    The violation of Bruce's constitutional rights was a direct, foreseeable, and proximate result of the Defendant City's custom of tolerance for its patrol officers to deny medical care to those in custody, including authorizing its patrol officers to take arrestees suffering from emergency medical conditions to jail as opposed to a hospital.

225.    As a direct and proximate result of the Defendant City's custom of tolerance for its patrol officers to deny medical care to those in custody, including authorizing its patrol officers to take arrestees suffering from emergency medical conditions to jail as opposed to a hospital, Bruce suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

226.    As a direct and proximate result of Defendant City's custom of tolerance for its patrol officers to deny medical care to those in custody, including authorizing its patrol officers to take arrestees suffering from emergency medical conditions to jail as opposed to a hospital, Bruce suffered catastrophic pain, suffering, emotional distress, anguish, personal injuries, and death.

227.    As a direct and proximate result of the acts described in this Count, Bruce's next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

228.    Cindyis entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

## Count VI
## MTCA - Negligence / Gross Negligence

### (Defendant City)

229.    Cindy incorporates herein each and every preceding paragraph as if fully set forth herein.

230.    Defendant City acted with negligence and reckless disregard pursuant to the facts and topics set forth above in this complaint.

231.    The Individual Officer Defendants acted with negligence and reckless disregard by failing to seek or provide medical attention for Bruce despite obvious and serious signs of a medical emergency. Defendant City is vicariously liable for the acts and omissions of the Individual Officer Defendants who were acting within the course and scope of their employment with Defendant City. Alternatively, if any of the Individual Officer Defendants are found to have not been acting within the course and scope of their employment with Defendant City at the time of the aforementioned actions and omissions, this claim is asserted against said defendants in their individual capacity.

232.    The actions and omissions of Defendant City, and those of Defendant City's employees acting within the course and scope of their employment, constitute a reckless disregard for the safety and wellbeing of Bruce.

233.    Defendant City's negligence, and that of its employees acting within the course and scope of their employment, proximately caused Bruce's injuries including his death.

234.    Bruce was not engaged in criminal activity at the time of his injuries.

235.    Cindy has met all administrative requirements of bringing state law claims against Defendant City.

236.     Bruce's injuries and death were a direct, foreseeable, and proximate result of the Defendant City's negligence as well as the negligence of Defendant City's employees who were acting within the course and scope of their employment.

237.     As a direct and proximate result of Defendant City's negligence as well as the negligence of Defendant City's employees who were acting within the course and scope of their employment, Bruce suffered compensatory and special damages as defined under common law and in an amount to be determined by a jury.

238.     As a direct and proximate result of Defendant City's negligence as well as the negligence of Defendant City's employees who were acting within the course and scope of their employment, Bruce suffered catastrophic pain, suffering, emotional distress, anguish, personal injuries, and death.

239.     As a direct and proximate result of the acts described in this Count, Bruce's next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

<u>**Count VII**</u>
<u>**42 U.S.C. § 1983 and Violation of the Fourteenth Amendment - Deliberate Indifference to Serious Medical Needs**</u>

**(Individual Jailer Defendants[13] and John and Jane Does 6-10)**

240.     Cindy incorporates herein each and every preceding paragraph as if fully set forth herein.

241.     The acts and omissions of the Individual Jailer Defendants identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference

---

[13] Individual Jailer Defendants refers to Defendant Johnson, Defendant Watts, Defendant White, and Defendant Hildesheim.

to serious medical needs in violation of the Fourteenth Amendment to the United States Constitution.

242.    The acts and omissions of the Individual Jailer Defendants identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs as defined by clearly established law.

243.    At all relevant times, the Individual Jailer Defendants were acting under color of state law, as agents of Defendant County, and within the scope of their employment and authority as a jailer or custodial official with Defendant County.

244.    The objective indicia available to the Individual Jailer Defendants were so obvious that even a layperson would have recognized Bruce required immediate medical attention.

245.    Every reasonable jailer or similar custodial official would have known that Bruce objectively required medical attention with information available to the Individual Jailer Defendants.

246.    Even a layperson would have known that Bruce was suffering from several serious medical needs and necessitated medical treatment.

247.    The Individual Jailer Defendants failed to seek medical attention for Bruce prior to his acceptance at RCDC and at all times thereafter.

248.    The Individual Jailer Defendants failed to summon medical attention and care for Bruce despite obvious signs that he was suffering from a medical emergency.

249.    Every reasonable jailer or similar custodial official would have known that it was deliberately indifferent to fail to provide medical treatment in the face of such easily recognizable and serious medical conditions.

250.    The Individual Jailer Defendants were deliberately indifferent in denying Bruce appropriate medical care that was obviously necessary.

251.    The Individual Jailer Defendants' failure to summon medical attention to Bruce after he was in a critical medical condition was deliberately indifferent and violated clearly established law.

252.    As a direct and proximate result of the Individual Jailer Defendants' deliberate indifference to serious medical needs, Bruce experienced catastrophic personal injuries and death.

253.    As a direct and proximate result of the Individual Jailer Defendants' deliberate indifference to serious medical needs, Bruce experienced catastrophic conscious pain, suffering, and emotional distress.

254.    As a direct and proximate result of the Individual Jailer Defendants' deliberate indifference to serious medical needs, Bruce eventually died of his injuries.

255.    As a direct and proximate result of the Individual Jailer Defendants' deliberate indifference to serious medical needs, Bruce suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

256.    Punitive damages are available against the Individual Jailer Defendants as a matter of federal common law and are hereby sought by Cindy.

257.    Alternatively, should it be found that any of the Individual Jailer Defendants did not directly participate in denying Bruce medical attention care, then this claim is asserted against said defendant(s) under supervisory and/or bystander liability.

**Count VIII**
**42 U.S.C. § 1983 and Violation of the Fourteenth Amendment - Deliberate Indifference to Serious Medical Needs**

**(Defendant Lago and John and Jane Does 11-15)**

258.    Cindy incorporates herein each and every preceding paragraph as if fully set forth herein.

259.    The acts and omissions of Defendant Lago identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs in violation of the Fourteenth Amendment to the United States Constitution.

260.    The acts and omissions of Defendant Lago identified and described in this count and in the preceding factual paragraphs constituted deliberate indifference to serious medical needs as defined by clearly established law.

261.    At all relevant times, Defendant Lago was acting under color of state law, as agents of Defendant Vitalcore, and within the scope of her employment and authority as a licensed practical nurse with Defendant Vitalcore.

262.    The objective indicia available to Defendant Lago were so obvious that even a layperson would have recognized Bruce required immediate medical attention.

263.    Every reasonable medical provider would have known that Bruce objectively required medical attention with information available to Defendant Lago.

264.    Even a layperson would have known that Bruce was suffering from several serious medical needs and necessitated medical treatment.

265.    Defendant Lago failed to seek medical attention for Bruce prior to his acceptance into RCDC and at all times thereafter.

266.    Defendant Lago failed to summon medical attention and care for Bruce despite obvious signs that he was suffering from a medical emergency.

267.    Every reasonable medical provider would have known that it was deliberately indifferent to fail to provide medical treatment in the face of such easily recognizable and serious medical conditions.

268.    Defendant Lago was deliberately indifferent in denying Bruce appropriate medical care that was obviously necessary.

269.    Defendant Lago's failure to summon medical attention to Bruce after he was in a critical medical condition was deliberately indifferent and violated clearly established law.

270.    As a direct and proximate result of Defendant Lago's deliberate indifference to serious medical needs, Bruce experienced catastrophic personal injuries and death.

271.    As a direct and proximate result of Defendant Lago's deliberate indifference to serious medical needs, Bruce experienced catastrophic conscious pain, suffering, and emotional distress.

272.    As a direct and proximate result of Defendant Lago's deliberate indifference to serious medical needs, Bruce eventually died of his injuries.

273.    As a direct and proximate result of Defendant Lago's deliberate indifference to serious medical needs, Bruce suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

274.    Punitive damages are available against Defendant Lago as a matter of federal common law and are hereby sought by Cindy.

**Count IX**
**42 U.S.C. § 1983 and *Monell* Liability - Conditions of Confinement**

**(Defendant County and Defendant Vitalcore)**

275.    Cindy incorporates herein each and every preceding paragraph as if fully set forth herein.

276.    Defendant County and Defendant VitalCore had the responsibility and duty to train, supervise, discipline, and oversee and control their employees at RCDC, as well as the duty to oversee and supervise the daily operations of RCDC.

277.    Defendant County and Defendant VitalCore had the duty to ensure that RCDC was maintained in a safe condition and compliant with constitutional requirements.

278.    Defendant County and Defendant VitalCore had the duty to ensure that RCDC personnel acted in compliance with the laws and Constitution of the United States, and did not act to deprive detainees and inmates of their rights guaranteed under the laws and Constitution of the United States.

279.    The duties of Defendant County and Defendant VitalCore included the duty to ensure that the conditions of confinement did not deprive detainees and inmates of their right to reasonable, adequate, and timely medical care, and did not otherwise impose what may constitute as cruel and unusual punishment.

280.    Defendant County and Defendant VitalCore maintained and operated RCDC in such a manner that the conditions of confinement resulted in a comprehensive and pervasive pattern of serious deficiencies in providing for the basic human needs of the detainees and inmates detained at RCDC.

281.    Said conditions of confinement also included many policies, practices, and customs as mentioned herein and which deprived detainees and inmates, including Bruce, of the right to reasonable, adequate, and timely medical care.

282.    The policies, practices, and customs set forth herein, as well as others which may come to light in the course of this litigation, resulted in numerous, repeated and pervasive deprivations of Bruce's right to reasonable, adequate, and timely medical care under the Fourteenth Amendment of the U.S. Constitution.

283.    As a direct and foreseeable result of said Defendants' actions and omissions, Bruce suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

284.    As a direct and foreseeable result of said Defendants' actions and omissions, Bruce suffered catastrophic pain, suffering, emotional distress, anguish, personal injuries, and death.

285.    As a direct and proximate result of the acts described in this Count, Bruce's next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

286.    Cindy is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### Count X
### 42 U.S.C. § 1983 and *Monell* Liability - Episodic Acts and Omissions

### (Defendant County and Defendant Vitalcore)

287.    Cindy incorporates herein each and every preceding paragraph as if fully set forth herein.

288.    The Due Process Clause of the Fourteenth Amendment to the Constitution of the United States requires that pretrial detainees be provided with basic human needs during confinement, including reasonable, adequate, and timely medical care as well as protection from harm.

289.    Defendant County and Defendant VitalCore had the responsibility and duty to train, supervise, discipline, and oversee and control their employees at RCDC, as well as the duty to oversee and supervise the daily operations of RCDC.

290.    Defendant County and Defendant VitalCore had the duty to ensure that RCDC was maintained in a safe condition and compliant with constitutional requirements.

291.    Defendant County and Defendant VitalCore had the duty to ensure that RCDC personnel acted in compliance with the laws and Constitution of the United States, and did not act to deprive detainees and inmates of their rights guaranteed under the laws and Constitution of the United States.

292.    The duties of Defendant County and Defendant VitalCore included the duty to ensure that RCDC personnel did not deprive detainees and inmates of their right to reasonable, adequate, and timely medical care, and did not otherwise impose what may constitute as cruel and unusual punishment.

293.    Defendant County and Defendant VitalCore maintained and operated RCDC under a set of policies, practices, and customs as mentioned herein and which deprived detainees and inmates, including Bruce, of the right to reasonable, adequate, and timely medical care.

294.    The policies, practices, and customs set forth herein, as well as others which may come to light in the course of this litigation, resulted in numerous, repeated and pervasive

deprivations of Bruce's right to reasonable, adequate, and timely medical care under the Fourteenth Amendments to the U.S. Constitution.

295.    The policies, practices, and customs set forth herein exposed detainees and inmates, including Bruce, to a substantial risk of serious harm.

296.    Defendant County and Defendant VitalCore, including their respective policymakers and subordinate employees and personnel, had subjective knowledge of the substantial risk of serious harm to which detainees and inmates, including Bruce, were exposed. Said Defendants nevertheless disregarded the risk by responding to it with deliberate indifference.

297.    As a direct and foreseeable result of said Defendants' actions and omissions, Bruce suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

298.    As a direct and foreseeable result of said Defendants' actions and omissions, Bruce suffered catastrophic pain, suffering, emotional distress, anguish, personal injuries, and death.

299.    As a direct and proximate result of the acts described in this Count, Bruce's next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

300.    Cindy is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

## Count XI
## MTCA - Negligence / Gross Negligence / Negligence *Per Se*

### (Defendant County)

301.    Cindy incorporates herein each and every preceding paragraph as if fully set forth herein.

302.    Defendant County acted with negligence and reckless disregard pursuant to the facts and topics set forth above in this complaint.

303.    The Individual Jailer Defendants acted with negligence and reckless disregard by failing to seek or provide medical attention for Bruce despite obvious and serious signs of a medical emergency. Defendant County is vicariously liable for the acts and omissions of the Individual Jailer Defendants who were acting within the course and scope of their employment with Defendant County. Alternatively, if any of the Individual Jailer Defendants are found to have not been acting within the course and scope of their employment with Defendant County at the time of the aforementioned actions and omissions, this claim is asserted against said defendants in their individual capacity.

304.    The actions and omissions of Defendant County, and those of Defendant County's employees acting within the course and scope of their employment, constitute a reckless disregard for the safety and wellbeing of Bruce.

305.    Defendant County's negligence, and that of its employees acting within the course and scope of their employment, proximately caused Bruce's injuries including his death.

306.    Defendant County's failure to provide adequate medical care to Bruce while he was in obvious medical distress also constitutes negligence *per se* pursuant to Miss. Code Ann. § 47-1-27, *inter alia*. Defendant County's statutory violations are a proximate cause of Bruce's injury and death and therefore constitute negligence *per se*. Said statute was at all relevant times

in full force and effect, the purpose of which is to protect from harm the class of persons of which Bruce was a member on the day of his injuries.

307.    Bruce was not engaged in criminal activity at the time of his injuries.

308.    Cindy has met all administrative requirements of bringing state law claims against Defendant County.

309.    Bruce's injuries and death were a direct, foreseeable, and proximate result of the Defendant County's negligence as well as the negligence of Defendant County's employees acting within the course and scope of their employment.

310.    As a direct and proximate result of Defendant County's negligence as well as the negligence of Defendant County's employees acting within the course and scope of their employment, Bruce suffered compensatory and special damages as defined under common law and in an amount to be determined by a jury.

311.    As a direct and proximate result of Defendant County's negligence as well as the negligence of Defendant County's employees acting within the course and scope of their employment, Bruce suffered catastrophic pain, suffering, emotional distress, anguish, personal injuries, and death.

312.    As a direct and proximate result of the acts described in this Count, Bruce's next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

## Count XII - Negligence / Gross Negligence / Negligence *Per Se*

### (Defendant Vitalcore)

313.    Cindy incorporates herein each and every preceding paragraph as if fully set forth herein.

314.    Defendant VitalCore owed a duty to Bruce to treat him in accordance with recognized and acceptable standards of medical care, nursing care, and treatment. Defendant VitalCore breached its duties to Bruce, which proximately caused Bruce's injuries.

315.    Under the doctrine of *respondeat superior*, Defendant VitalCore is legally responsible for the actions and inactions of its employees including Defendant Lago, which were performed in the scope of their employment and duties with Defendant VitalCore.

316.    Defendant VitalCore's failure to provide adequate medical care to Bruce while he was in obvious medical distress also constitutes negligence *per se* pursuant to Miss. Code Ann. § 47-1-27, *inter alia*. Defendant VitalCore's statutory violations are a proximate cause of Bruce's injury and death and therefore constitute negligence *per se*. Said statute was at all relevant times in full force and effect, the purpose of which is to protect from harm the class of persons of which Bruce was a member on the day of his injuries.

317.    Bruce's injuries and death were a direct, foreseeable, and proximate result of the Defendant VitalCore's negligence as well as the negligence of Defendant VitalCore's employees who were acting within the course and scope of their employment.

318.    As a direct and proximate result of Defendant VitalCore's negligence as well as the negligence of Defendant VitalCore's employees who were acting within the course and scope of their employment, Bruce suffered compensatory and special damages as defined under common law and in an amount to be determined by a jury.

319. As a direct and proximate result of Defendant VitalCore's negligence as well as the negligence of Defendant VitalCore's employees who were acting within the course and scope of their employment, Bruce suffered catastrophic pain, suffering, emotional distress, anguish, personal injuries, and death.

320. As a direct and proximate result of the acts described in this Count, Bruce's next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

### Count XII - Loss of Consortium

### (All Defendants)

321. Cindy incorporates herein each and every preceding paragraph as if fully set forth herein.

322. At all times material hereto, Cindy and Bruce were married.

323. That as a result of the wrongful and negligent acts and/or omissions of Defendants, and each of them, Cindy was caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, affection, assistance, and companionship.

324. Cindy's resulting damages and losses are the direct and proximate result of Defendants' collective and/or individual actions and omissions.

### DAMAGES

325. Cindy incorporates herein each and every preceding paragraph as if fully set forth herein.

326.     As a direct and proximate result of the actions and omissions of Defendants, Bruce and Cindy suffered damages including, but not limited to, medical and funeral expenses, pain and suffering, mental anguish, past and future lost wages and loss of life.

327.     Cindy, on behalf of the wrongful death beneficiaries to Bruce, is legally entitled under the Mississippi Wrongful Death Statute, Miss. Code Ann. § 11-7-13, to recover in this action all damages for all wrongful death beneficiaries of Bruce whose death was legally and proximately caused by the acts and omissions of the defendants.

328.     Cindy is entitled to punitive damages against the Individual Officer Defendants, Individual Jailer Defendants, Defendant Lago, and Defendant VitalCore, in that said Defendants actions were taken maliciously, willfully, wantonly, or with a reckless disregard of the constitutional rights of Bruce.

329.     As a result of the acts and/or omissions set forth herein, Defendants are liable for all elements of damages arising from the violation of Bruce and his wrongful death, including but not limited to the following:

    a.  Damages for the physical and mental pain and suffering of Bruce prior to his death;

    b.  Damages for the mental anguish suffered by Bruce prior to his death;

    c.  Damages for the loss of financial support and maintenance which Bruce provided and would have continued to provide to Cindy and his family;

    d.  Damages for the loss of love, companionship, society, advice Bruce's family suffered and will suffer in the future;

    e.  Damages for the funeral expenses resulting from the death of Bruce;

    f.  Damages for the value of life of Bruce;

g.  Damages for all other losses, both economic and intrinsic and tangible and intangible arising from the death of Bruce;

h.  Lost wages and wage earning capacity of Bruce;

i.  Past medical expenses of Bruce;

j.  Extreme mental anguish and emotional distress of Bruce;

k.  Mental anguish, emotional distress, and mental pain and suffering of Cindy and the wrongful death beneficiaries;

l.  Punitive damages on all state and federal claims;

m.  Pre-judgment and post-judgment interest;

n.  Attorney's fees;

o.  Punitive damages.

### AD DAMNUM

**WHEREFORE, PREMISES CONSIDERED,** Cindy seeks judgment against Defendants, jointly and severally, in an amount to be determined by the trier of fact.

**RESPECTFULLY SUBMITTED,** this the 14th day of May 2025.

By: _____

JOSH DANIEL, MS Bar No. 104275
JOSH DANIEL LAW
398 E Main St, Ste 111
Tupelo, Mississippi 38804
Telephone: (662) 205-0701
Facsimile: (662) 500-0426
Email: josh@joshdaniellaw.com

*Attorney for Cindy Kennon*

## Certificate of Compliance and Expert Consultation

UNDERSIGNED COUNSEL hereby certifies, pursuant to Miss. Code Ann. § 11-1-58, as follows:

1.     Prior to filing the Complaint in this case, undersigned counsel reviewed the facts of the case and consulted with at least one expert, qualified pursuant to the Mississippi Rules of Civil Procedure and the Mississippi Rules of Evidence, who is qualified to give expert testimony as to the standard(s) of care or negligence and who undersigned counsel reasonably believes is knowledgeable in the relevant issues involved in this action; and

2.     Undersigned counsel has concluded on the basis of such review and consultation that there is a reasonable basis for the commencement of such action.

By:     _____

JOSH DANIEL, MS Bar No. 104275
JOSH DANIEL LAW
398 E Main St, Ste 111
Tupelo, Mississippi 38804
Telephone: (662) 205-0701
Facsimile: (662) 500-0426
Email: josh@joshdaniellaw.com

*Attorney for Cindy Kennon*